The next case that the panel will hear is Dunne v. Elton Corp, Appellate No. 23-1499, 23-1501, 23-1503, 23-1511, 23-1518, 23-1526, 23-1546, 23-1868, and 23-1869. Good morning and may it please the Court. I'm Anthony Shelley here on behalf of the six appellant grandchildren. I've reserved two minutes of my time for rebuttal. In my time today, I'm going to focus, of course, on the five issues the Court identified in its order from last Friday, and I'd like to move through them one by one. And my colleague, Mr. Killian, First Republic's counsel would then supplement from the trustee's perspective. If I could just, for a few brief sentences, though, make an overarching point about our perspective of this case, because it does affect our view and answers to the questions. And that is that the plaintiff here attempts to transform what was a gift trust created in 1947 into a perpetual ERISA plan requiring millions of dollars of funding. And the district judge ignored all the ways that the trust doesn't meet the ERISA mold and instead thought he was to do equity. But ERISA applies here, and happily, the Court's questions really focus on what ERISA does require. So the first question, the Court asked, what are the factors for determining a pension plan, whether a pension plan is a single employer plan or a multiple employer plan, and which type is the trust? So there are two factors. The first is for a plan to be a multiple employer plan. The first is that there must be a bona fide association of employers tied by a common economic or representation interest unrelated to the provision of benefits. So that is the group must have at least one substantial business purpose other than providing benefits. So that's the first factor. The second factor is that the association or group must exercise control over the form and substance of the benefit program through an established infrastructure. Those factors come from DOL advisory opinions, DOL regs, and most importantly from this Court's case in Gruber, which the trustees specifically cited. And the regulation I mentioned is 29 CFR section 2510.3-55b1. Under these, the two factors I outlined, the trust plainly does not meet them. On the first factor, there's no common economic or representational tie among the grandchildren. They don't engage in any economic activity at all. They aren't a representative trade association, and there's certainly no business purpose tying them together. So it has to be an economic or business purpose that ties them? Separate from the provision of benefits, yes. The only tie is a blood relation other than the benefits, and that's not a business purpose. On the second factor, there's no organizational infrastructure among them. There's no board of directors for the group. There's no bylaws, and certainly they're not controlling, through that, controlling the benefit program. In fact, the trustees lawyer, excuse me, the trustees witness noted that they didn't even, the trustees don't even view the grandchildren as interested parties here. So they're not controlling the benefit plan. So without factors one and two, which you have to have both, there's no multiple employer plan. You have, at best, a group of single employer plans, and that raises the standing problem that we have. Can you explain why, based on the plain language of the statute, Elton and First Republic and any other trustees didn't act indirectly in the interest of the grandchildren or the qualified employers? So first of all, there was never any authority given to them from the grandchildren. So they couldn't act indirectly on their behalf because there was no delegated authority from the grandchildren. But also importantly, the DOL's reg that I mentioned has a provision specifically noting that a trust, a bank, an insurance company can't be acting, deemed an employer indirectly acting on behalf of the actual employers. And that's because oftentimes then you could see pension plans or particularly health plans, too, turning into essentially marketing efforts by those trying to make money in providing pension plans. So I think what that language is referring to is a bona fide association, one where employers have come together to create an entity with a business purpose, with infrastructure, and to provide benefits. And then that association could be acting indirectly for the employer. But again, we don't have that here. So the second question, was the purported plan or plans established or maintained by an employer without regard to interstate commerce? The answer is no. Establishment, when there is it, is a one-time event. If it happened here, it occurred in 1947. But Mrs. DuPont, the grandmother back in 1947, she evinced no intent to set up a perpetual employee benefit plan to constrain her or her heirs. And intent is the key. She sought to give a one-time gift that, for the benefit of her domestic employees, but she made no promise of vested benefits for eternity to those individuals or her heirs. And it's clear from the fact that the trust has a provision in it saying the trust runs out, it ends. So she couldn't possibly have had a long-term intent to create a perpetual plan of vested benefits. That's the establishment. And then the court asked the same question, was the plan maintained by an employer? Again, the answer to that from our perspective is no, because the grandchildren, none of them maintained the trust. The legal test that we've noted in our briefs is who had primary ongoing responsibility for the trust, coming from cases like Advocate Health, Sanzoni, the Eighth Circuit case, Bowdoin, which is a Kentucky District Court case. In that instance, it would be the trustees. If there's any maintainer here, it would have to be the trustees, because they have ongoing primary responsibility for the administration of the plan. I'm going to use first names, because there's so many grandchildren with similar last names. So Lana's recommendation is that maybe an alternate trustee should be selected, or maybe we should get an opinion about whether ERISA applies. Doesn't that convince a desire to maintain the trust? I don't think so. I think acquiescing or knowing of something existing or worrying about a problem is not maintaining a trust. Could you be a bit concrete in what maintain means under ERISA? Support, sustain, have ongoing primary responsibility for it. That's what maintain means, and that really comes from the three cases. What about having the power to decide who gets a pension? Well, that would have, that could go to the, that could go to the question of maintenance, but we did not have the power. Why doesn't the evidence show, why doesn't the evidence support a reasonable inference that the grandchildren had practical power to direct the trustees to pay them? Because it doesn't, the district court's findings at most indicate that the grandchildren could suggest people to be covered, and then it would be the trustees who had the discretion and the eligibility responsibility in that situation. At best, it's a ministerial task of identifying individuals. In fact, many of the people weren't identified by them, but a couple of the people went directly to the trustees because they were the ones determining eligibility. And I think this court, if I may, you know, when we think about, I think 1948 is when this got started. 47, yeah. Yeah, before ERISA, when it was created, when it was established, do you think it was also at that point in time maintained by the grandmother? I do not. Because the trustee just took over right then and there. She gave all the powers to the trustees. There's no power she retained. She couldn't even amend it. She couldn't revoke it. So typically, in ERISA cases, you get a very common theme in ERISA cases, successor liability. One company has a pension plan. Someone else just wants to buy the assets. They don't want the plan. And then we have to find out, oh, are you stuck with the plan? Are you a valid successor? But it strikes me that what you're saying is if the grandmother wouldn't even kind of meet the definition of establish and maintain, then that question of who's downstream, kind of per scurvy is downstream, we'd need something really, really different unless we have kind of established that was a grandmother, and then no one else kind of put the trust out of its box, and the trust is one that you say is doing all the maintaining. In one word answer, yes. That is exactly our point of view. She didn't, the document originally didn't evince an intent to create an ERISA plan that would look, eventually be called an ERISA plan. She didn't maintain it. It was a gift. She was done with it. And she did it out of charity and the goodness of her heart, and she thought if there's money left over, my children could take advantage of that, or others down the line, or their employees, excuse me, could get the benefit of that. But none of the idea, the momentous idea of creating an ERISA plan is evinced in that trust document from the beginning. I see my time is up. Let me just see if my colleagues have any other questions. Do you want to finish responding to the questions we put to you, or is that something you're going to defer? I'd be happy to quickly go through the other three, and I think Ms. Killington. Just because we asked for the questions, we're going to give you the time to answer us, if you don't mind. Excellent. Thank you, Your Honor. These are terms of art in the jurisprudence, and they demand the existence of commercial activity. But these, the record indicates that some of these folks had, you know, equestrian operations. There was movement across state lines to engage in that activity. Ms. Williams herself was paying taxes for a variety of people. She and Walt had traveled together. Yeah, I was going to add to that. Ms. Williams testified that she traveled across state lines while working for Wright. ERISA defines commerce to include transportation or communication between any state and any place outside thereof. Why isn't Williams traveling across state lines with Ms. Wright? Because it's not commercial activity. Domestic employment, working on the private affairs of an individual, is not commercial activity in the first instance. So whether someone traveled over state lines to do it doesn't suddenly transfer you into a business that's engaged in commerce or affecting commerce. It has to be commercial activity in the first instance. Where do you get that commercial activity overlay on commerce, given the definition of commerce in this context and the way it's phrased? From the Jones case, the Supreme Court's Jones case, also from Circuit City. Circuit City was an arbitration case. And I'm talking about ERISA because from your point of view, if we adopted a view that no one who works to provide domestic services to a family who's got the kind of opportunities that this particular family had would ever be subject to arbitration. Exactly. That would be our perspective. Because the domestic employees, even if we had establishment and maintenance and we satisfied all the other things, because they never engage in any kind of commercial activity. I still don't know where you're getting the commercial part as opposed to in commerce. Money making. Money making activity, an enterprise, an enterprise where one of the grandchildren is using these individuals to make money. Did any of the stables make money? The people who are involved in making money through the stables aren't covered by this plan. So they're not relevant to the plan. The people who are doing the domestic private affairs of our grandchildren, they're the only people covered by this. And so it gets complicated. But Ms. Williams was paying all the taxes. She was doing the W-2s. She was involved in all of that activity to support all of these operations. You don't think there's a basis to conclude there's some activity in commerce here? Well, I think we have to go back to the language of the statute. And really, Your Honor, I beg to differ that the Circuit City case is actually relevant. Because while it's an arbitration case, I think it was Justice Kennedy went into what does the term in commerce mean in general? Not just in the FAA. I get it. As opposed to affecting commerce, involved in commerce, I'm with you. Right. And then Jones gets into the question of what does the affecting commerce mean when it's preceded by terms like used in or engaged in an activity or industry affecting commerce. And those are key. Because it was in Jones then where the court said it has to be for a commercial purpose. And doing thank you notes, helping someone bathe or do things around the house, even doing garden work in front of the house, that is not commercial activity for that individual. And I think these cases determine that. And one thing I'd add on that, too, there isn't a single case our opponents have cited that says domestic employment constitutes activity in interstate commerce or qualifies for ERISA. And in fact, we cited a 1956 IRS revenue ruling that says it's not. It's not commercial activity. Quickly on the fourth question, then, who are Kimberly Williams' employers for purposes of ERISA and what evidence shows the employers maintain the plan? The answer is her employer was Mrs. Wright solely. And, Your Honor, I think your question earlier would come into play there and my answer would be the same, that the trustees are not the employer but only Mrs. Wright. And there's no evidence that Mrs. Wright maintained the plan. And the district court, first of all, got the maintenance test wrong. And that's why he held that there was maintenance. Actually, he didn't hold that there was any maintenance. He didn't address that issue. He got to fiduciary conduct and that's the facts on which the other side seeks to use those findings to show maintenance. But again, from the cases, Mrs. Wright would have had to have ongoing primary responsibility for the plan in order for her to maintain it. What the judge did in saying this was he cherry-picked facts from each grandchild and then said, collectively, they all maintain the trust. That was error. But the record itself shows, for instance, that JA 1135, Wright never intended to provide benefits to her employees. She never mentioned it. She never mentioned any pensions to her employees. As of around 2000, this is a JA 1190, she thought the trust had no money and therefore was of no use to even mention to people. She first read the trust document in 2013, that's a JA 1142. The first employee to seek eligibility came in 2018 and it was a surprise to everyone that the trustees approved it. That's at JA 1143. And Wright's own attorney described this as a gift, not subject to any sort of ERISA applications. And I think that's at JA 1157. So our position is that Mrs. Wright and none of the other grandchildren maintained this plan. They had no ongoing responsibility, control, or actually involvement in the administration of the plan. So that leads us to the fifth question, and that is, what is the meaning of the phrase provided for in the funding exemption set forth in 30185? And our answer is, provide for means to stipulate or make provision for. In this court's case, Appalachian States controls this. In that case, the court said, in a different setting, but in a general way, said the term provided for is not ambiguous and it does not mean permit. It specifically said it does not mean permit, but it requires affirmative activity such as stipulating. The court, honestly, the court can't get around that case. Opponents can't get around that case, because provide for doesn't mean anything differently a few years before then or a few years after. And the court went to the dictionaries there. So Concord Control, the outcome actually supports us, because there, there was a stipulation of employer contributions. And so ERISA has none of that. But more importantly, to the extent there is language there that is unhelpful, it's not persuasive at this point. It's based on a snippet of legislative history that would not be determined. It talks about employee contributions as opposed to employer contributions. Correct, it does. And if you look at ERISA in context, the exception right before, so it's A4 in Section 301, 1081A4, does mention, make more clear that that is slightly different, but it won't apply, it will apply whenever essentially only employees contribute. And Congress knew what it was saying. ERISA is highly articulated, and language right before this provision is relevant to this provision. So Concord Control, the focus on the legislative history, it wouldn't happen to you, of course. And it also was not correct to do in the first place. Thank you, Your Honor. Good morning, Your Honors. May it please the Court? May I reserve just one minute for rebuttal? That really hadn't been the plan. No, we would prefer none. Okay, then. Well, no disrespect, but that was not the plan that we understood. We understood that there was only going to be one end of advocate and rebuttal. If we're in a misunderstanding from that, I'm happy to be corrected, but we did not understand that. No, that's fine. Then I'll just take my seven minutes now. So good morning. My name is Brian Killian. I represent the trustee for First Republic Trust Company. First Republic is in a bit of an unusual position in this case in that it sued all the grandchildren but agrees with them that the grandchildren and First Republic are not liable in this situation. And that's owing to the fact that six months after taking the job as trustee, First Republic was sued along with Elton for tens of millions of dollars allegedly in ERISA underfunding. And as a mere trustee, First Republic's position is it has no responsibility to pay for funding. And if there's a funding obligation, it would fall upon the employers who are the grandchildren. And so First Republic did the only thing it really could do in that situation, which is to implead the grandchildren. So I raise that to say that, by and large, our positions are aligned with the grandchildren on the threshold questions that the court has asked the parties to address of whether ERISA applies to the trust and whether the minimum funding obligation applies to this trust as well. But if the court decided otherwise, if the court decided that ERISA does apply, and if the court decided the trust is not exempt, then our interests diverge pretty sharply because there are some very trustee-specific arguments for why First Republic cannot be held responsible. Before you go there, because you obviously know from our letter there were subjects we were trying to make an argument to.  There's a lot of moving parts, as you know. Absolutely. Most importantly, at least from my point of view, and I'll turn it to my colleagues, is are you incorporating by reference your colleagues' responses to the questions? That's why we allowed them to go extra time, to make sure we had a complete answer to all of our questions, to avoid redundancy if that's possible. You represent a different client. You are completely at your rights to offer a different view. But at least as to the questions that we pose, do you have anything you want to add? I would say 90 percent I incorporate. There's one or two things he said that I disagree with. That's really, I think, what we'd like you to focus on, if you don't mind. Yeah, absolutely. So I don't intend to walk through the five questions, and all I meant to say, Judge Schwartz, was that if the court wanted to address any trustee-specific arguments, I will. But I understand from Your Honor that we don't want to. I'll turn that question over to my colleagues to see if they have particular questions on that. Go ahead. Okay. So I think the way we'd come at the five questions is really to point to four of this Court's and the Supreme Court's cases. And Mr. Shelley actually addressed three of them already, so I won't belabor the point. Gruber v. HBKW, which goes to the Court's first question. It goes to the first question, and I won't repeat the test, but what I do think is really significant about Gruber is that the Court first looks at the question, is this a multiple employer plan? And then because it fails that test, the Court says, well, then this must be a collection of individual plans. And that was in accordance with the Department of Labor opinion. So this Court used the exact same analysis that we suggest should apply to answer the first question. Mr. Shelley discussed Circuit City. I won't go into that again, except to say that the Court did address a wide range of cases, more than just the Federal Arbitration Act. And I would note the Court addressed some antitrust cases that it decided. The Supreme Court decided in 1974, the same year that ERISA was enacted, and sort of gives an inference that Congress used the phrase engaged in commerce, the exact same year the Supreme Court authoritatively interpreted that term as being narrower than interstate commerce. The third case, one that he hasn't addressed, is Shaver v. Siemens, this Court's decision from 2012. That goes to the second and the fourth questions about the meaning of establish or maintain. At pages 475 to 476 of the Court's decision there, the Court said, quote, the critical question is not whether there was a sponsor, not just whether anybody was doing it, but, quote, whether, and in that case it was Siemens, the employer, established or maintained the plan. The Court required an alignment of the activity with the individual who was doing it with the employer. And it went on over a couple pages to describe the sort of activity that qualifies as maintaining a plan. Talk to us about that, about what they said in Shaver, about maintaining the plan, and how does that correspond to either the presence or absence of the facts in this record? Sure. So I'm looking at page 476 of the Court's decision, and it proceeds for several pages, but one of the key elements that this Court mentions as necessary to demonstrate maintenance of a plan is ongoing financial responsibility, that there is some sort of funding, there is some sort of financial activity in order to maintain a plan. The activity of, and this is one of the points where I disagree with Mr. Shelley, because we don't believe that First Republic was maintaining the plan in the sense that this Court has defined the concept of maintenance in cases like Shaver. What First Republic and Elton beforehand did was to manage assets and to write checks to the beneficiaries, and that sort of routine work that all sorts of trustees, that banks do all the time, isn't the full suite of activity that the Court described. It used words like sponsor-funded, operated, and administered. Because who maintained this plan? If the kids didn't do it, the trustees didn't do it? Our position is no one maintained it in the ERISA sense. When it was set up, it was set up to be irrevocable. It was set up to be unamendable. There was no ongoing contribution requirement, and I think most importantly, the trust by its own terms is going to expire when all the assets deplete. And so the plan was not being maintained in the ERISA sense, that it was not being continuously supported in order to sort of financially provide for the benefits. It was really just a gift in that when it's depleted, it's gone. You would answer the question I asked differently. That is, just because one had the ability to direct the payment, that that person isn't maintaining the plan? That is incomplete to qualify as maintenance. It could be an aspect of it, but it's not sort of the full suite of activities that the court normally looks to for maintaining an ERISA plan. What do we need the trustees for? Like, what were they doing? We didn't need them to make sure that they were watching that the right people were being paid? I mean, somebody must have been taking care of this in some way. Well, the trustees possessed the assets and did the investments. That's their response. That's their job, right? It's the line of business for a company like First Republic Trust Corporation, and we think they do it very well, right? So that's why people want to give trustees and banks, especially, the control to manage the investments to do it as best as possible, but that doesn't mean it's maintenance in the ERISA sense. Your position is there is a specific definition for maintenance in the ERISA, and I recognize it's not, like, defined, but how would you define it? What should we look for? Yeah, I think the court would look to the sorts of activities that are normally needed for carrying on in perpetuity or for an extremely long time, the sort of plans that ERISA is designed to cover. The Supreme Court addressed that. Your colleague says that it's support, sustain, and have ongoing responsibility for. I think that's what it is. Yeah, and I think that's pretty close. Do you think that's good enough? Do you want to add to that? I would say that it depends which dictionary you're looking at, Judge Hips. I think that those are some of the common dictionary definitions, but support is a key one. I mean, support is what the financial contribution hangs on. It's not the same. Just managing the investments is not supporting it. There needs to be something else. Yeah, I mean, that's kind of interesting. What extra would First Republic have to do to maintain? So if you said, okay, we don't maintain. We fall short of maintain because we don't do X. What fits into that X bucket? Well, a variety of things. One is we don't put money into it. Two, it's not our employees, and we are not intending, as the key word from the Supreme Court's cases in this context, there's no intent to provide benefits on First Republic. And so managing assets in the way that someone's investment advisor might do for them is not the same thing as maintaining a plan in the way that ERISA has described. And if we look at the statute, I know I asked you who maintained it and why it wasn't the trustee, but if we look at the statute, the actor for maintain is the employer. The employer, correct.  So even if we were to conclude the conduct of the trustee here was akin to dictionary definitions or even the definition shavers of maintaining, if it were, we're not the actor covered by ERISA for maintaining, am I correct? Absolutely correct. That's not the employer. Correct, absolutely. And I will also note that Ms. Williams, on page 79 of her brief, concedes, as she should, that First Republic is not the employer. The last case that I want to mention, and then I'll sit down, Your Honor, is the Appalachian States case. And I know Mr. Shelley did discuss it in connection with the scope of the exemption in 1081A5. I think we know that Congress used the phrase provided for in 1081A5 in accordance with its ordinary meaning because of another provision in the minimum funding section, which is 1082B. 1081 says which plans are covered for minimum funding. 1082 says what are the obligations for minimum funding when a plan is covered. 1082B specifically states that when there is a minimum funding shortfall that has to be covered, it, quote, shall be paid by the employer responsible for making contributions to or under the plan. When there is no employer who is responsible for making contributions to or under the plan, Congress naturally excluded that plan under 1081A5. So our view is that 1082B, 1081A5 are in pari materia. The language provided for, the words provided for in 1081A5, are linked to this contribution responsibility, in the words that Congress used, under 1082B. So that shows that what this court held is the plain meaning of the phrase provided for in Appalachian States is indeed the meaning that Congress intended when it wrote 1081A5. So those are the four cases that we think the court should take into account in reversing the district court here. Let me just make sure I don't have any further questions. Okay. Yeah. You did exactly what we needed you to do. Thank you so much. Thank you.  Good morning. May it please the court. I'm Elizabeth Hopkins on behalf of Plaintiff Appellee Kim Williams. Before I dive into the really interesting and apt five questions that this court asked, I think it's helpful to set a little bit of a framework by talking about the ERISA framework here. ERISA, it's celebrating its 50th anniversary this year, and it was really landmark and broad and remedial legislation when it was passed a half a century ago in 1974. It governs nearly all private pension plans other than church plans and government plans, but those are not private, obviously, including thousands that were in existence at the time of ERISA's enactment, many of which did not meet the stringent requirements of the act. And, of course, it regulates the many, many more that have formed since that time. I would just say that one of the animating goals of Congress in passing the statute was to make sure that defined benefit pension plans, and that's what this plan is because it provides a set monthly benefit that you can determine for the covered employees, that those plans were funded in order to ensure that employees don't end up empty-handed during their retirements, and I just have to respond to this notion that this was a gift. This may have been a gift by Mary T. Chester DuPont to her grandchildren, but an employer has no obligation to provide a pension plan, but once it does so, the pension plan is not a gift to those employees. It's an employment benefit, and it's governed by federal law. ended when the money went out? As I said, many plans that were in existence at the time that ERISA was passed had terms that were not compliant with ERISA. ERISA has a specific provision for A1D that says that you follow the terms of the plan, but only to the extent that those are in compliance with ERISA. So those many plans that you're talking about that existed when ERISA came into existence and that are governed now by ERISA, presumably are governed by ERISA because someone maintained the plan. How specifically did Wright maintain the plan? Yes, Your Honor. I mean, that's probably true that someone maintained those plans, but I would point out that the coverage provision, like many, many of the provisions of ERISA, is extremely broad, and we're talking about a provision that says, specifically, a plan to be covered by ERISA has to be established or maintained by an employer, including activities affecting interstate commerce. So you're in a position that if we determine that the original, so I'll use first names too, Mary established the plan and no one maintained the plan, it would still be covered by ERISA? That is correct. This is a disjunctive test. The Eastern District of Pennsylvania recognizes correctly in Solis v. Carrasco, which was affirmed by this court, but it's been recognized by a number of other courts, and it's sort of indisputable that it's established or maintained. I'll grant you that. I'll give you that because the courts are disjunctive, but the actor, again, is who is the actor? The actor here has to be the employer. Lana was the employer of your client. What evidence do we have that your client, that Lana, established the plan? None. We just established Mary established it. And building on that, that is based on the assumption, that's based on the fact, not the assumption, the fact that ERISA uses is when it's talking about established or maintained. So presumably that means present tense. ERISA didn't exist when Mary created the plan. So who, since the plan's creation, has established or maintained the plan? And let me focus. Has right, since the plan's existence, established or maintained the plan? Yes, Your Honor. Obviously no one established the plan after ERISA was enacted. Each one of the qualified employers, and, you know, I think it's quite helpful that they're referred to in the trust document as employers, qualified employers, each one of them maintained the plan in the sense that, in the most relevant sense, quite honestly, in the fact that each of them slated some of their employees to be put on pension. That is the most fundamental way in which you can maintain a plan. That just lets them know they're eligible to collect from it. They let them know that they were eligible, and they spoke with the trustees about giving them the benefits. And quite frankly, an employer is also defined very broadly to be a person, and a person includes corporations acting directly or indirectly for an employer, or directly in the interest of the employer in relation to the employee benefit plan, and includes a group or association of employers. This includes virtually everyone here in this case. So focusing on right, though, focusing on right, not lumping together, focusing specifically on right. The district court, as I understand it, found that the trustees determined whether or not an employee was entitled to the pension plan. Not recommending, but entitled to the pension plan. Are you telling us that right had the ability to determine that someone was entitled to a pension plan? I think that the trustees did make the final determination, but they had no way of even knowing who the employees were. Let me ask you a question. So suppose a lawyer writes to a plan and says, I've got this client who is entitled to the pension plan. Has the lawyer now maintained the plan under your definition? Well, for one thing, the lawyer writes and says that they have. The lawyer represents a client, one of the employees. Right. And says my client is entitled to a pension under this plan I've heard about. Is the lawyer, has the lawyer maintained the plan under the definition you're asking us to adopt? No, because the definition turns on an employer establishing or maintaining a plan. This is an employment statute. It's about employee benefits. This was a benefit for the employees of all of the grandchildren, the qualified employers in this case. So not identifying the person for the plan that establishes the plan, just being an employer establishes the plan. I'm sorry, maintains the plan. Just being an employer. No, there was more activity. How do you define maintain? We've got this undefined term in the statute. We've got your two friends on the other side. They give us definitions that overlap but probably aren't complete. I'd like to hear from you. How do you define maintain? Congress didn't do us any favors by not defining it. Yes, Congress defined a lot of things here. That's what's shocking. They define so, so, so many things and then maintain silent. How do you define it? What do you think it means for purposes of ERISA? Consistent with the broad remedial purposes and the broad coverage purposes, which all courts have recognized, I think you have to read it to include all its possible definitions, including a very ordinary one, which is to cause or enable a state of affairs to continue. And certainly I would say every one of the employers did that. If you look at the record here, it's quite clear that... Let me just tease that out. You say to allow a state of affairs to continue. To cause or enable a state of affairs to continue. That's kind of an interesting situation because at one level that builds off establish, right, because establish is what kind of put it into work. But then it seems that you could be forever passive just as long as you just didn't interfere with it. You're maintaining. Don't you think your friends on the other side kind of think that there's a little more activity? One of them says there has to be a lot of activity. Just managing assets isn't good enough. The other one says that, you know, maybe managing assets is good enough. And you seem to say, no, you can be pretty passive and still maintain something as long as you kind of don't tank its operation. That would be maintaining. Basically anything that doesn't tank its operation is maintaining. I think that the intent was very broad here. But let me say this. There's a lot of evidence here of a lot more activity. For instance, immediately after ERISA's enactment, the trustees of the trust were actually three of the children of Mary T. Chester DuPont. It was Felix DuPont and two of his sisters were both before and after the enactment of ERISA were actually the trustees. A little bit later on, after his sisters passed away and his sister-in-law passed away, Felix DuPont incorporated his family office. Elton Corporation was his own family office. He incorporated that and made it co-trustee. Ultimately, Elton Corporation became the sole trustee when Felix DuPont passed away himself. You know, there is no question that there was an employer. There were employers actually who were involved in the maintenance of the plan after ERISA. That's the only question. It's not whether each of the employers maintained the plan, but I would say that they do. Not only did they slate employees to receive pension benefits, and therefore had the benefit of this gift from their grandmother. But as I say, it wasn't a gift to the grandchildren. It might have been a gift to them. But they slated their own employees. They wanted to have their cake and eat it, too. They wanted this benefit for the benefit of at least some of their hand-selected employees, not all the employees who were entitled, I would say. It probably would only work if we conclude this is a multiple-employer plan, because you're trying to tag the conduct of the parents of the grandchildren, pre the existence of Elton, as being qualified employers. And so if they did something to maintain the plan at that generation, that's enough. But doesn't that require that we have to conclude this is a multiple-employer plan? I don't think so. I mean, the two factors, I would say, as to whether this was a unitary plan, was what did the trust provide. The trust clearly provided for one unitary set of funds, one unitary set of trustees and administrative procedures, and the plan was operated as one unitary trust for over 50 years. There's no unitary language in ERISA. We've got multiple employers, multi-employers, and single employer. Which bucket is it in? Actually, this is a single-employer plan. A single-employer plan can include a plan. It's somewhat counterintuitively sponsored by a group, one or more employers. It's clear that ERISA provides this in Section 3.5 of the statute in the definitional section of employer, in Section 3.16, the definition of a plan sponsor. And throughout, honestly, the history of ERISA, there's a box on the Form 5500 that allows you to check whether a plan is sponsored by more than one employer. But the only two real categories in the statute are single-employer plans or multi-employer plans, which are collectively bargaining. Clearly, this isn't that. That says that the employers must have a bona fide connection unrelated to the provision of benefits. Is family relationship enough, familial relationship enough? Yes, it is enough. I would say that the CFR site that my friends on the other side cited, 29 CFR 2510.3-55, that is a regulation that applies to defined contribution plans. It does not apply in this context at all. This is a general pool of assets rather than individual dedicated accounts. That's the very definition of what a defined benefit plan is. And I don't think at this point in the litigation anyone disputes that this was what it was. It was a defined benefit plan. And it's never, ever been operated as four or six or seven or more plans, one for each of the qualified employers. I think that history, that 50, really 70-plus year history, is extremely relevant. And it points in the same direction as the trust. I mean, this was always how it was. Are you advocating that it is a single employer plan, a collection of single employer plans? It's not a collection of single employer plans. It's a unitary defined benefit plan, and it's one plan. Where in the law is there something called a unitary defined benefit plan? It's, I mean, it's- I hate to pick on you about language, but the statute is so language sensitive that I want to make sure that we're putting it in the right bucket. Right. I mean, it fits into the definition of a single employer plan because it's not a multi-employer plan that's collectively bargained. As I said, you know, there are indications throughout the statute that such a plan can be sponsored by more than one employer. This is not unheard of. You know, in certain contexts where, for instance, a plan is not established by an employer but is basically an insured arrangement, usually those involve health care plans, you know, the Department of Labor has been concerned and has required a bit more in order to see a relationship. But that's because it really doesn't fit the established or maintained by an employer. Here, the employers are at the heart of this, and their employees are at the heart of this. This is an unusual situation in some sense, but in other senses, it was contemplated by ERIS, and that's why these broad definitions really do work in this context. If you'd like me to address any of the other questions, I would be happy to. We've answered all the questions that we have, and we appreciate your arguments. All right. I don't get to talk about commerce. That's okay. Thank you very much. Appreciate it. And I just urge this court to affirm the holding of the district court in all respects. Thank you. Thank you for your argument. Just a couple of very brief points. The regulation I mentioned is actually entitled Definition of Employer Association Retirement Plans and Other Multiple Employer Pension Plans in the Regs. It is focused in its beginning part on defined contribution plans, but it's very broadly worded and useful for any kind of plan, as Gruber is as well. Ms. Hopkins, I think, mixed in the 1980s different roles that individuals can play as a trustee or as an employer, and it was incorrect to do so because ERIS allows people to wear different hats, and certainly none of those people are the grandchildren today. And the last point I would make on maintenance, I don't think we're in much disagreement on maintenance. I think my colleague, I have a view of maintenance as about this big. His is a little bigger. And under either one, the grandchildren are not maintainers. Do you go so far as to say that no one maintained this? He says this plan just maintenance is a term of art under ERISA, and no one maintained this plan. Do you say that no one does, or do you say that his client does? Our argument from the beginning has been this doesn't qualify under ERISA, and no one maintains it as an ERISA plan, certainly. And it would be, we've only argued that if you have to find a maintainer, it would be the trustees. It just wouldn't be the employer. So you're a little closer than you were letting on. That's not true.  That's where I went, the same cadence. And we'd ask that the court reverse on any of a number of grounds that each of us has presented in our briefs. All right. Thank you very much. The court appreciates the arguments offered by all counsel. We would ask the court crier to communicate with counsel about obtaining a transcript. We ask the parties to split the expense of the transcript of today's argument. The court will take the matter under advisement.